■    DOLORES FERRER et al., Respondents, v JOHN M. HILL et al., Third-Party Plaintiffs Defendants-Appellants. FIVE TOWNS HOLDING CORP., Third-Party Defendant-Respondent.—In an action, *inter alia,* for specific performance of a contract for the sale or realty or, in the alternative, for damages, defendants appeal from a judgment of the Supreme Court, Suffolk County, entered January 26, 1978, which, *inter alia,* awarded plaintiffs $232,372, after a nonjury trial. Judgment reversed, on the law, and new trial granted, with costs to abide the event. The property which is the subject of this action, consists of seven and one-half acres of unimproved property known as Ivy Beach and runs from the Great South Bay to the Atlantic Ocean on Fire Island in the Town of Islip, County of Suffolk. This property had been purchased by the defendants in 1972. The defendants' predecessor in title had obtained tentative approval in 1971 from the Town of Islip for 48 building parcels on the subject property provided the "applicant * * * contact the Sewer Agency relative to sewage collection and disposal" and subject to a "Satisfactory recreational offer". In August, 1972, prior to the execution of the subject contract, the defendants submitted a required "Application For Approval of Sanitary Facilities For Realty Subdivisions" to the Suffolk County Department of Health. On June 25, 1973 the proposed subdivision of the entire parcel was approved provided that the over-all density for both the northerly and southerly parts of the parcel does not exceed 30 lots and that the subdivided 30 lots "should be confined primarily to Section One" (the southerly portion of the property). This determination was adopted by the Commissioner of the Suffolk County Department of Health by letter dated July 11, 1973. On October 11, 1973 the defendants entered into a contract to sell the southerly part of the subject parcel to the third-party defendant Five Towns Holding Corp. The sale price was $365,000, with the sellers agreeing to a purchase-money mortgage of $315,-000 payable in three years at 9%. The purchaser also had an "option of first refusal" to buy the northerly half of the parcel for $157,500 plus engineering expenses and the cost of constructing a marina, land fill and map filing. It had a further option, in the event it chose not to exercise the option to buy, to lease 15 boat slips in the marina to be erected by the sellers, at a rental "for the lease terms equal to 50% of the amount being charged to all other renters or lessees of the Marina slips" (contract rider par 5). Paragraph 1 of the contract rider provides: "The Sellers agree to (a) file and have approved a Map embracing the described property so as to show thirty (30) building plots in the same manner as outlined on the map attached hereto and made a part hereof and marked 'EXHIBIT A', and (b) proceed diligently and expeditiously to obtain full approval of said map and cause the same to be filed". Pursuant to this paragraph, the purchaser also agreed to reimburse the sellers for any improvement bond that was required. (The option to purchase the northerly half of the parcel was to expire 15 months from

the date "upon which the Purchasers receive notification, by certified mail, of the filing of the map" on the southerly half.) Paragraph 9 of the contract rider provides as follows: "If Sellers shall be unable to convey title in accordance with the terms of this agreement, the down payment made hereunder shall be refunded, and all the rights and obligations of the Sellers and Purchaser hereunder shall thereupon become null and void". On October 15, 1973 the contract vendee, Five Towns Holding Corp., for valuable consideration, assigned all its "right, title and interest" in and to the contract dated October 11, 1973 to the plaintiffs herein. After the signing of the contract in October, 1973 the defendants submitted plans to the Town of Islip for final approval of the proposed subdivision, and after a hearing, the Town of Islip Department of Planning and Development, by letter dated April 30, 1974, denied the application for the following reasons: "a) The Suffolk County Health Department is willing only to approve a total of thirty (30) lots from Ocean Bay; b) Two to four lots on the south end may be in the Dune District and cannot be built on; c) Technically, the northern portion of the property should be designated as lot #31 because it is part of the subdivision; d) The applicant has not furnished any evidence concerning the origin of the voluminous amounts of fill necessary to bring the properties up to Health Department standards, nor the effects which the individual cesspools will have on the ground water". This denial was followed by another application being submitted to the Islip Department of Planning and Development based on a clustered zone concept. On August 7, 1974 the department notified the defendants' attorney that it was prepared to recommend the acceptance of a clustered development based on the following conditions: "a) Applicant-owner(s) to provide Town with a 50 ft. easement along the dunes for purposes of preserving their existence. No buildings or other improvements to be permitted within said easement except a wooden walk across said easement to permit residents of this subdivision to reach the ocean. b) The two (2) 'dune' lots be increased in size to a minimum of at least 11,000 sq. ft. including the 50 ft. dune easement area mentioned in 'a' above. c) Maple Walk to be straightened and widened to width of twenty (20) ft. d) To permit proven yield of 30 plots, interior plots may be reduced to a minimum of 5,000 sq. ft. and 55 ft. frontage. Corner lots to conform to minimum 6,000 sq. ft. requirements of Residential 'BAA' zone. e) To satisfy the Health Department requirements, applicant-owner(s) to file deed restrictions on parcel north of Maple Court agreeing not to request any building permit until approved subdivision plan is filed in County Clerk's Office or rezoning is granted for some other 'Permitted Use' ". A third application was then made, this time to the Suffolk County Department of Environmental Control, for approval of the subdivision. The application was conditionally approved provided "that the area between Maple Court and Great South Bay [i.e., the northerly portion] should be dedicated for public or semi-public use and/or restrictive covenants should be filed on said parcel so that the number of lots for the entire 7.353 acres does not exceed 30, in keeping with the Health Department Board of Review determination of June 25, 1973". This latter reference was to the approval of the earlier subdivision application made by the defendants prior to the execution of the contract and which was adopted by the health department in its letter of July 11, 1973. Finally, a fourth application was made, again to the Department of Environmental Control, for 30 building parcels on the southerly part of the parcel with the northerly parcel to be used for recreational uses (i.e., tennis courts) and not for a subdivision development. Plans were submitted to the Department of Environmental Control in April, 1975. Following a hearing held on

April 29, 1975, the Department of Environmental Control, by letter dated April 30, 1975, denied the application stating: "At the hearing of the Suffolk County Sewer Agency held on April 29, 1975 in Hauppauge, New York, your request to use the land on the above mentioned map between Maple Court and Great South Bay for private recreational purposes was denied by the Agency, since the Agency felt that the approval granted at the meeting of November 8, 1974 was predicated on the fact that the subject parcel would remain in its natural state". (An article 78 proceeding was commenced with respect to this latter application.) The plaintiffs then demanded that the defendants convey title to the southern half of the property. The sellers refused and this action for specific performance followed. (At the time of trial the above-mentioned article 78 proceeding remained undecided.) At the conclusion of a nonjury trial held in connection with the action for specific performance, the trial court awarded damages in lieu of specific performance in the amount of $232,150. This figure represented the difference between $605,000, i.e., the value of 28 lots at $19,500 each and two lots on the ocean front at $29,500 each, as testified to by the plaintiffs' expert, and the total of the purchase price of $365,000 and the cost of improving the lots ($17,850), as testified to by the plaintiffs' expert, plus the down payment of $10,000. In holding in favor of the plaintiffs the trial court found that "the fact here is that the sellers can convey title in accordance with the contract, although it would be costly". The "costly" aspect of performance of this contract arises out of the fact that in order to obtain approval of the subdivision map of the southerly half and recover the purchase price of $365,000 from the buyers, the sellers would have to agree to restrict, either by dedication or a recorded restriction, the use of the northerly part, which plaintiffs' expert valued at $347,000 if development was allowed, and for which the buyers had an option to purchase at $157,500 plus engineering expenses and the cost of constructing a marina, land fill and map filing. The trial court held that the contract was "valid, capable of performance and not barred by law" because if "what is agreed to be done is possible and lawful the obligation of performance must be met". After so finding, the trial court concluded that "this is not a case where specific performance should be granted [since t]o order specific performance would be to order the defendants to comply with that which may be beyond the powers of the Health Department to require". Instead the trial court awarded damages to the plaintiffs. In our view, the judgment must be reversed and a new trial granted for two reasons. Firstly, the trial court failed to make findings of fact as to substantial factual issues which would be relevant and material to the intention of the parties at the time this contract was entered into and which could materially alter the sellers' obligations and the buyers' rights herein. Secondly, even assuming, *arguendo,* that the plaintiffs are entitled to damages, the trial court, in measuring damages, did not consider certain relevant factors which would have significantly reduced the final award. The testimony at the trial presented crucial factual issues as to whether the buyers, like the sellers, had knowledge of the condition of approval adopted by the Health Department in its letter dated July 11, 1973 and whether the contract as entered into was part of a mutually agreed and preconceived strategy by both the buyers and the sellers to overcome this restriction. A finding that the buyers had knowledge of this restriction would make such knowledge as binding upon the buyers as the court made it upon the sellers. If, in fact, the buyers had knowledge of this restriction at the time this contract was entered into for the outright purchase of the southerly portion of the parcel for $365,000, with an option

to purchase for $157,500 plus other substantial costs the northerly parcel, which was subject to the restriction, such knowledge would be relevant and material as to the intention of the parties at the time the contract was entered into. It would lend substance and credence to a finding that this contract was executed in this manner as part of a preconceived strategy by both parties for the purpose of removing or modifying this restriction. In our view, it seems incredible that the sellers would have been agreeable to this contract, in its present form, if they alone knew of the restriction which had been placed on the northern half of the parcel since, under those circumstances, they would be obligated to file and have a subdivision map approved for the southern half even if that entailed the exorbitant cost of restricting development of the northern half, and would be liable to the buyers for breach of contract for their failure to obtain the approval and convey title. It is, therefore, much more plausible to assume that the buyers also had knowledge of this restriction prior to the execution of this contract in its present form and that there was an implicit understanding between the parties that (a) the restriction could be removed or substantially modified by diligent efforts and (b) if the restriction could not be so removed, the down payment would be refunded to the buyers and all rights and obligations of the sellers and buyers under the contract would become null and void. During the course of the trial, the sellers sought to introduce evidence to the effect that the then deceased president of the contract vendee had discussed this particular restriction and other conditions which might be imposed and that the latter indicated that he would use his influence to have this restriction and other conditions removed. Although this testimony was initially ruled inadmissible, at the end of the trial the court ruled that the dead man's statute was not applicable and that this testimony was admissible. Although the court gave credence to the testimony that the buyers' political influence had been discussed and that the buyers, like the sellers, were aware that in order to obtain approval, there was "a problem in getting dredging rights to fill in some of the lower property on the north side", it made no specific findings as to the buyers' knowledge with respect to the restriction contained in the July 11, 1973 letter of the County Health Department and the intention of the parties in the context of this knowledge. In addition to this testimony, it is also of significance that the buyers, when faced with the realization that the sellers were not willing to file a map in accordance with the restriction imposed by the town authorities, did not immediately demand that the sellers do so and convey title to them. Instead, they allowed the sellers to make repeated attempts to have the restriction on the northern half removed and, according to the sellers' testimony, the buyers even prepared and paid for the plans for the final application by the sellers which proposed tennis courts for the northern half. This behavior on the part of the buyers is clearly consistent with a finding of fact that the buyers intended to buy the whole parcel as one unit, and with knowledge of the restriction on the northern half were acting in concert with the sellers to eliminate or substantially modify this restriction before any part of the contract would become operative. A specific finding of fact as to the buyers' knowledge of the restriction on the northern half of the property was obviously most crucial to a resolution of this case. Although this court has the right to make findings of fact with respect to factual issues, it is preferable to have such findings made in the first instance by the trial court. Finally, in our view, the following relevant factors were apparently not considered in measuring damages: (1) the admittedly higher development costs on Fire Island than on the mainland;

(2) the cost to the buyers of carrying this property after purchase pending development or resale, including taxes and interest on the mortgage; (3) expenses such as legal fees related to the acquisition and disposition of this property and real estate commissions attendant upon the resale or disposition of the property; (4) the cost to the buyers of providing and moving the "voluminous amounts of fill" required by the health department to bring the property within its standards; and (5) the diminished value of the two to four lots in the dune district which could not be built on. For these reasons, the judgment must be reversed and a new trial granted. Damiani, J. P., Suozzi, Rabin and Hawkins, JJ., concur.